Scofield, J.,
delivered the opinion of the court:
June' 1, 1861, the United States were indebted to the Virginia Central Eailroad for carrying the mail in the State of Virginia from January 1,1861, to May 31,1861, over aud above all credits, in the sum of $7,239.54.
Prior to March 3, 1877, this whole demand was barred by the statute of limitations. At that time so much of it as originated before the State of Virginia “ engaged in war against the United States” was revived and brought within the jurisdiction of the court in the following manner:
“By the act of March 3, 1877 (19 Stats. L., 362,), Congress appropriated—
“ ‘ Three hundred and seventy-five thousan dollars to pay the amount due to mail contractors for mail se vice performed *313 in the States of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Texas, Tennessee, Virginia, and West Virginia, for the years 1859, 1860, and 1861, and before said States respectively engaged in war against the United States. * * * Provided, That any such claims which have been paid by the Confederate States government shall not be again paid.’
“In order that the claims embraced in this appropriation might be paid pro rata, in case it should be found insufficient to cover them all, the Secretary of the Treasury directed that none should be paid until all should have been received and adjusted. In consequence of this order no claims were paid within two years. The whole appropriation, as the law requires, was therefore returned to and covered into the Treasury. The claimant sues to recover the amount to which he might have been entitled under the lapsed appropriation.
“In Hukill's Case (16 C. Cls. R., 562) this court held that the rights of parties provided for in this appropriation were not lost by its return to the Treasury, but remained subsisting rights which this court had jurisdiction to enforce. That case also decided that the legislation of the Confederate States created a presumption that contractors on routes within the insurrectionary States were paid by that government, which presumption the claimant must, as a condition precedent to recovery, in some measure rebut.”
All the facts tending to overthrow such presumption, in the case at bar, are set forth in finding IV, but no opinion thereon is now given by the court.
At what time Virginia “ engaged in war against the United States” is more a question of fact and'history than of law.
‘ In January, 1861, the legislature passed an act providing for the assembling of a convention to consider the question of secession. The convention assembled February 13,1861, and on April 17,1861, passed the ordinance of secession with this provision: “This ordinance shall take effect and be an act as of this day when ratified by a majority of the votes of the people of this State, cast at a poll to be taken on the fourth Thursday in May.” It was ratified on that day. April 16, 1851, the governor of the State refused to furnish its quota of volunteers called for by the President, and concluded his letter of refusal as follows: “You have chosen to inaugurate civil war, and having done so we will meet it in a spirit as determined as the administration has exhibited towards the South.” April 17, 1861, the convention passed an ordinance requiring the governor to “ call out as many volunteers as might be neces *314 sary to repel invasions and protect the citizens of the State.” In pursuance thereof the governor, on April 16,1861, did issue a proclamation reciting the supposed grievances against the United States, and ordering “ all volunteer regiments and companies to hold themselves in readiness for immediate orders, and to report at once to the Adjutant-General their organization and numbers, and prepare themselves for efficient service.” On the same day the State authorities took possession of the custom-house at Richmond, and soon after of the navy-yard at Norfolk and the arsenal at Harper’s Ferry. April 24, 1861, the convention placed the military forces of the State under the control of the President of the Confederacy, and on the next day adopted the provisional constitution of the Confederate States. By the subsequent ratification of the ordinance all these preparations for and declarations and acts of war, and seizures of United States property, were also ratified.
From these facts the court is of the opinion that Yirginia should be held to have “ engaged in war against the United States” April 17, 1861.
The amount earned by services in carrying the mail over and above the credits prior to April 17, 1861, was $4,682.31.
By a simple change of name the Virginia Central Railroad Company became the Chesapeake and Ohio Railroad Company, and in the latter name was entitled to recover the amount due from the United States. Upon this question there is no dispute. But the Chesapeake and Ohio Railroad Company is not the claimant of record.
The Chesapeake and Ohio Railway Company is the party on record, and derives whatever title it has to the claim through the mortgage sale and deed, as shown in Finding I. Several sections of the Code of Yirginia affecting the case are, for convenience, also printed in finding I. From these documents it appears that no debts due the Chesapeake and Ohio Railroad Company were included in the mortgage, sale, or deed. By the Code of Yirginia, as shown in finding I, it is also provided that debts due to a corporation shall not pass to the purchaser by virtue of a mortgage and sale. It can hardly be doubted, therefore, that the claim still belongs to the Chesapeake and Ohio Railroad Company and not to the claimant of record. In this view of the case no question under section 3477 of the Revised Statutes is involved, because no assignment has been made or attempted.
*315 A suit now begun in the name of the Chesapeake and Ohio Eailroad Company, the legal and equitable owner of the claim, would be defeated by the statute of limitations.
To avoid this difficulty two motions, alternate in character, have been made to amend the petition. One proposes to insert the Chesapeake and Ohio Eailroctd Company for the use of the Chesapeake and Ohio Raib«M/ Company, and the other to strike out the latter name and insert the former.
Here we have two parties distinct in name and adverse in interest, but both consenting to the motions: The one party has a claim without a suit, and the other a suit without a claim. The party with a suit is in danger of defeat because of defect of title, and the party without a suit is forbidden by the statute of limitations to begin one now. To bring the suit and claim together so as to avoid failure of title on the one hand and the statute of limitations on the other is the object of the motions. One motion proposes to assign in effect, though not in form, the claim to the present suitor, and the other to assign the suit to the owner of the claim.
We do not see our way clear to allow either motion.
In the Thomas Case (15 C. Cls. R., 343), cited by the claimant in support of the motion, certain rules are laid down governing amendments for the introduction of new parties. The first rule there stated is that, “ The court will refuse amendments when they propose to introduce new parties, not in privity of interest with those who instituted the proceedings.” In that case the claim belonged to the estate of John H. Thomas, deceased. His widow, who was sole executrix and principal legatee, brought the suit in her own name. The amendment proposed to add “ executrix of John H. Thomas.” About the rule above stated there appears to have been-no disagreement in the court, but whether the facts of that case came within the rule was the subject of difference. Upon that question the chief justice gave a vigorous dissent, and Judge Nott said, “As the diversity of opinion which exists, concerning the power of the court to allow this amendment, shows that the question is a doubtful one, I am of the opinion that, for the purposes of a review in the Supreme Court, the amendment should be allowed, as of course.” It cannot well be doubted that the rule above stated is a correct one, whatever may be thought, of its application to the facts of that case. That case had been be *316 fore the court (12 C. Cls. R., 278) on a similar motion, but based upon a statement of facts somewhat different. The same rule was laid down there. Judge Nofct, speaking for the court, saidr
u In numerous cases under the abandoned and captured property act, such changes of parties have been allowed after the jurisdictional period for bringing such suits has expired, but in all of them * * * the party substituted possessed some legal relations concerning the thing in suit, with the party who, in due time, instituted the action.”
At that time the motion to amend was dismissed $ two of the judges dissenting.
In the case of Payan (7 C. Cls. R., 401), cited by the claimant in support of the motion, the suit was begun in the name of the equitable owner, and the amendment allowed the party holding the legal title to be placed upon record for the use of the petitioner. In that case the privity of interest existed, as required by the rule above cited. A similar privity of interest was shown in Green’s Case (7 C. Cls. R., 496), also cited in support of the motion.
In the case at bar there is no privity of interest whatever between the two corporations. The claimant was never in law or equity the owner of the claim, but, on the contrary, was, in the eye of the law, an entire stranger to it; The original owner never assigned it nor attempted to assign it to the claimant or any one else.
For these reasons we are constrained to overrule the motions to amend.
The motions being overruled, the claimant’s petition must be dismissed.